```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
THE BURTON CORPORATION,                 :
                    Petitioner,         :
                                        :     10 Civ. 3163 (DLC)
          -v-                           :
                                        :     OPINION & ORDER
SHANGHAI VIQUEST PRECISION INDUSTRIES   :
CO., LTD.,                              :
                    Respondent.         :
                                        :
----------------------------------------X
```

APPEARANCES:

For Petitioner:

Joseph G. Fortner
Halloran & Sage LLP
225 Asylum St.
Hartford, CT  06103

For Respondent:

Mark V. Heusel
Dickinson Wright, PLLC
301 E. Liberty Street
Ann Arbor, MI  48104

Omar N. Chaudhary
Butzel Long
350 S. Main Street
Ann Arbor, MI  48104


DENISE COTE, District Judge:

 Petitioner, The Burton Corporation ("Burton"), has filed a petition to vacate in part an arbitration award (the "Award") arising out of a manufacturing agreement with respondent Shanghai ViQuest Precision Industries Co., Ltd. ("ViQuest").

ViQuest has cross-petitioned for confirmation of the Award.  For the following reasons, Burton's petition to vacate is denied and ViQuest's cross-petition to confirm the Award is granted.

BACKGROUND

1.  The Agreement

Burton is a Vermont-based designer, manufacturer, and seller of snowboards and related equipment.  ViQuest is a manufacturer of injection molded products based in Shanghai, China.  On January 16, 2005, Burton and ViQuest entered into a manufacturing agreement (the "Agreement"), pursuant to which ViQuest would manufacture snowboard bindings for Burton using Burton's molds.[1]  The Agreement provided for an initial one-year term, but automatically renewed for successive one-year periods unless Burton provided written notice of cancellation sixty days prior to expiration of the relevant period.  The Agreement is governed by Vermont law.

The Agreement contains several provisions relevant to this dispute.  Pursuant to § 4.05 of the Agreement, Burton could terminate the Agreement if it determined "that [ViQuest]'s financial position poses a risk to Burton's business."  The Agreement also provides that Burton could request that ViQuest return its molds at any time.  Specifically, § 2.04(d) provides,

---

[1] The Agreement was retroactively effective as of August 1, 2004.

in pertinent part, that "[ViQuest] will tender and deliver all Molds to Burton upon request provided Burton has reimbursed Supplier for all outstanding mold costs."  In addition, § 2.04(d) provides that, "[u]pon the termination of this Agreement for any reason, [ViQuest] will, at Burton's request, return all Molds in good working order."

The Agreement contains a mandatory arbitration clause. Section 7.09 provides, in pertinent part, that "[e]ach dispute arising out of or in connection with this Agreement . . . shall be finally settled by binding arbitration . . . and judgment upon the award rendered by the arbitrators may be entered in any court of competent jurisdiction."  Section 7.09 further provides that "[t]he arbitrator shall endeavor to follow the law, principles of equity and judicial precedents of applicable Vermont law."  The cost of any arbitration was to be borne "by the losing party," or, if there was no losing party, "as the arbitrators shall determine."

Section 7.10(a) limits the types of damages available under the Agreement in the event of any dispute.  It provides, in pertinent part, that the parties waive "any right or claim for punitive or exemplary damages against the other and agree that in the event of a dispute between them, each party shall be limited to the recovery of <u>actual</u> damages sustained by it." (Emphasis added.)  Finally, § 7.08 provides that, in the event

of court action "to interpret or enforce" a party's rights under the Agreement, "the prevailing party shall be entitled to reasonable attorney's fees and costs."

2.   Burton Terminates the Agreement

On August 1, 2005, the Agreement automatically renewed for an additional one-year period, i.e., through July 31, 2006 (the "2006 fiscal year").  At Burton's request, ViQuest produced photo-samples for products to be produced during the 2006 fiscal year and received orders from Burton for the preparation of such samples, but there was no actual purchase order for the production of bindings.  On October 6, 2005, Burton provided notice to ViQuest that it was terminating the Agreement pursuant to § 4.05 due to "financial concerns."  It is undisputed that at the time of termination, Burton owed ViQuest approximately $1.8 million in unpaid purchase orders.  Burton requested that ViQuest return its molds, but ViQuest refused.  Burton arranged with a third-party to manufacture molds to replace those retained by ViQuest.

3.   The Arbitration and Award

On May 19, 2006, Burton filed a claim with the American Arbitration Association seeking, inter alia, the return of its molds and reimbursement of $355,244.00 in costs incurred to replace the molds.  ViQuest counterclaimed, seeking, inter alia,

4

lost profits of $726,135.34, which it claimed it would have earned in the 2006 fiscal year had Burton not terminated the Agreement in October 2005.

On January 15, 2010, the arbitration panel issued the Award, from which one of the three arbitrators partially dissented.  The majority of the panel interpreted § 4.05 of the Agreement to mean that Burton could validly terminate the Agreement "only after <u>reasonably</u> proving that [ViQuest's] financial position posed a financial risk to Burton's business."  (Emphasis added.)  Applying this "reasonableness" standard, the majority determined that Burton had not "proved the existence of valid grounds to terminate the [Agreement]."  Further, the majority found that, at the time the Agreement was terminated, Burton itself was "not [in] compl[iance] with its contractual obligations to pay for product received."  As a result, the majority concluded that the Agreement "was not terminated pursuant to valid grounds under its provisions."

With respect to Burton's request for the return of its molds and reimbursement of costs for the replacement molds, the majority acknowledged that under § 2.04(d) of the Agreement, "Burton [was] entitled to the return of all molds."  The panel concluded, however, that "Burton was not entitled to count on the return of such items upon termination when it was not itself fulfilling its own obligations to pay [ViQuest] for deliveries

5

of bindings to Burton." Accordingly, the majority concluded that "ViQuest [was] not to be held responsible for any moneys spent by Burton having toolings, molds or other items manufactured . . . in replacement of those held by [ViQuest]."

As for ViQuest's counterclaim, the majority awarded $360,780.70 in lost profits for the 2006 fiscal year. The majority found that under Vermont law, the term "actual damages" in § 7.10(a) of the Agreement "includes loss of profit" as defined under Vermont's Uniform Commercial Code ("U.C.C."), and therefore such damages were permitted under the Agreement. Although ViQuest had not provided sufficient evidence of the exact amount of lost profits for the 2006 fiscal year, the Panel concluded that it could reasonably calculate lost profits based on the net profits earned by ViQuest in the previous year. The majority nonetheless awarded a lower amount of lost profits than ViQuest requested, in part because of uncertainties about ViQuest's business and because there was "no evidence that [ViQuest] undertook to find a replacement for Burton . . . or that it looked for other customers."

Lastly, the majority determined that pre-Award interest should accrue from the date that the amounts owed under the Agreement became due and payable through the date of the Award at a 5% annual rate. Post-Award interest was also awarded at a 5% annual rate. The majority concluded that because neither

6

Burton nor ViQuest had "entirely succeeded on their respective claims," they would each bear their own attorney's fees and costs, and would split the cost of the arbitration.

On April 14, 2010, Burton filed a petition to vacate the Award in part. ViQuest filed its opposition and cross-petitioned for confirmation of the Award on May 28. The briefing was fully submitted on June 9.

DISCUSSION

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 et seq., provides a "streamlined" process for a party seeking "a judicial decree confirming an award, an order vacating it, or an order modifying or correcting it." Hall Street Assocs. L.L.C. v. Mattel, Inc., 552 U.S. 576, 582 (2008).[2] Under § 9 of the FAA, "a court 'must' confirm an arbitration award 'unless' it is vacated, modified, or corrected 'as prescribed' in §§ 10 and 11." Id. (quoting 9 U.S.C. § 9). Section 10(a) of the FAA sets forth four situations in which a court may vacate an arbitration award, only the fourth of which is invoked by Burton: "[W]here

---

[2] The parties agree that the cross-petitions are governed by the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38, reprinted at 9 U.S.C. § 201 (the "Convention"). Because the arbitration took place in the United States, however, the Award is at the same time subject to the FAA provisions governing domestic arbitration awards pursuant to Article V(1)(e) of the Convention. See Zeiler v. Deitsch, 500 F.3d 157, 164 (2d Cir. 2007) (citing Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc., 126 F.3d 15, 21-23 (2d Cir. 1997)).

7

the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter was not made." 9 U.S.C. § 10(a)(4).

The Court of Appeals for the Second Circuit has "consistently accorded the narrowest of readings to [§ 10(a)(4)], in order to facilitate the purpose underlying arbitration: to provide parties with efficient dispute resolution, thereby obviating the need for protracted litigation." ReliaStar Life Ins. Co. of N.Y. v. EMC Nat. Life Co., 564 F.3d 81, 85 (2d Cir. 2009) (citation omitted) ("ReliaStar"). Thus, a party seeking vacatur of an arbitration panel's decision "must clear a high hurdle." Stolt-Nielson S.A. v. AnimalFeeds Int'l Corp., 130 S. Ct. 1758, 1767 (2010). It is not enough "to show that the panel committed an error -- or even a serious error. It is only when an arbitrator strays from interpretation and application of the agreement and effectively dispenses his own brand of industrial justice that his decision may be unenforceable." Id. (citation omitted).

Under § 10(a)(4), the proper inquiry is therefore "whether the arbitrator's award draws its essence from the agreement to arbitrate . . . . If the answer to this question is yes, . . . the scope of the court's review of the award itself is limited." ReliaStar, 564 F.3d at 85-86 (citation omitted). The court does "not consider whether the arbitrators correctly decided the

8

issue" and should "uphold a challenged award as long as the arbitrator offers a barely colorable justification for the outcome reached."  Id. at 86 (citation omitted).  Thus, "as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, a court's conviction that the arbitrator has committed serious error in resolving the disputed issue does not suffice to overturn his decision."  Id. (citation omitted).

Courts in this circuit have also vacated arbitration awards that are in "manifest disregard of the law."  See T. Co Metals, LLC v. Dempsey Pipe & Supply, Inc., 592 F.3d 329, 339 (2d Cir. 2010).  While the future of the "manifest disregard" standard is unsettled, see Stolt-Nielson, 130 S. Ct. at 1768 n.3 (stating that the Supreme Court would "not decide whether 'manifest disregard' survives"), in this circuit, "manifest disregard" has been reconceptualized as "a judicial gloss" on the FAA's specific grounds for vacatur, and so interpreted, "remains a valid ground for vacating arbitration awards."  T. Co Metals, 592 F.3d at 340 (citation omitted).

"[A]wards are vacated on grounds of manifest disregard only in those exceedingly rare instances where some egregious impropriety on the part of the arbitrator is apparent."  Id. at 339 (citation omitted).  Such impropriety requires "more than error or misunderstanding with respect to the law, or an

9

arguable difference regarding the meaning or applicability of law urged upon an arbitrator." Id. (citation omitted).  Thus, an award "should be enforced, despite a court's disagreement with it on the merits, if there is a <u>barely colorable justification</u> for the outcome reached." Id. (citation omitted).  "With respect to contract interpretation, this standard essentially bars review of whether an arbitrator misconstrued a contract." Id. (citation omitted).

    Burton has failed to carry its significant burden of showing that the majority exceeded its authority or acted in manifest disregard of the law.  Accordingly, Burton's petition to vacate the Award in part must be denied.

1. Termination of the Agreement

    Burton argues that the majority exceeded its authority by holding that Burton improperly terminated the Agreement in October 2005.  Burton contends that § 4.05 of the Agreement granted it absolute discretion to terminate if it determined that ViQuest's financial position posed a risk to Burton's business.  Burton criticizes the majority for grafting a "reasonableness" requirement onto § 4.05 and for substituting its own judgment for Burton's business judgment.  Burton's argument is without merit.

10

In interpreting § 4.05 to require that Burton demonstrate a reasonable basis for terminating the Agreement, the majority was "arguably construing or applying the contract and acting within the scope of [its] authority." ReliaStar, 564 F.3d at 86 (citation omitted). Burton does not argue, nor could it, that the majority was not authorized by the Agreement's arbitration provision to construe the Agreement, or that the majority did not apply Vermont law, as required under the Agreement. Burton itself sought arbitration of its contractual dispute with ViQuest. Thus, there can be no doubt that the majority had the power to adjudicate the parties' contract claims. As such, even if the majority "committed serious error" in interpreting § 4.05 of the Agreement, such error would be insufficient to overturn the majority's decision.

In any event, there is no indication that the majority committed serious error here. It can be inferred from the Award that the majority derived the reasonableness requirement from the covenant of good faith and fair dealing, which Vermont law recognizes is implicit in every contract. See Dist. Lodge 26, Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. United Techs. Corp., No. 10-0702-cv, -- F.3d --, 2010 WL 2680619, at *9 (2d Cir. July 8, 2010) (acknowledging the implied covenant of good faith and fair dealing under Vermont law); accord Monahan v. GMAC Mortg. Corp., 893 A.2d 298, 304 (Vt. 2005) (same). The

11

majority may have plausibly concluded that the implied duty of good faith and fair dealing required Burton to have a reasonable basis to believe that ViQuest's financial situation posed a risk to Burton's business before terminating the Agreement.  Indeed, such a rule has been recognized by the Vermont Supreme Court. See Carmichael v. Adirondack Bottled Gas Corp. of Vt., 635 A.2d 1211, 1216 (Vt. 1993) ("Regardless of broad unilateral termination powers, the party who terminates a contract commits an actionable wrong if the manner of termination is contrary to equity and good conscience." (citation omitted)).  Thus, the majority clearly had more than a "barely colorable justification" for the outcome it reached.

Burton argues that even if a reasonableness requirement exists under § 4.05, the majority erred because Burton had sufficient grounds to terminate the Agreement.  After a detailed review of the evidence, the majority concluded that Burton "had not proved the existence of valid grounds to terminate the [Agreement]" in October 2005.  The majority found that Burton's purported reasons for termination lacked any basis in fact, and further, that Burton had acted in bad faith by withholding over $1.8 million in payments owed to ViQuest, which put pressure on ViQuest's financial situation.  Even if the majority erred in making these findings, however, an erroneous factual determination is insufficient to vacate an arbitration award.

See, e.g., Westerbeke Corp. v. Daihatsu Motor Co., Ltd., 304 F.3d 200, 213 (2d Cir. 2002). Accordingly, Burton has not provided an adequate basis to vacate the majority's conclusion that Burton did not have reasonable grounds to terminate the Agreement in October 2005.

2. Replacement Mold Costs

Burton argues that the majority should have granted its application for reimbursement of the replacement mold costs. Burton contends that under § 2.04(d) of the Agreement, it could demand the return of its molds from ViQuest "at any time." When ViQuest refused to return the molds despite Burton's request, Burton claims that it had a right to replace the molds and seek damages. Burton criticizes the majority for "re-writing the Agreement" to reach a conclusion "reflecting its own view of justice." This argument is similarly without merit.

The majority found that Burton could not "count on the return of [the molds] upon termination when it was not itself fulfilling its own obligations under the [Agreement] to pay [ViQuest] for deliveries of bindings to Burton." It can be reasonably inferred that the majority based its decision on the fundamental principle of contract law that "a party's performance under a contract is excused where the other party has substantially failed to perform its side of the bargain."

Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc., 500 F.3d 171, 186 (2d Cir. 2007) (New York law).  Since the majority explicitly found that Burton had "not compl[ied] with its contractual obligations to pay for product received [from ViQuest]," which would constitute a material breach of the Agreement, the majority's decision that Burton could not insist that ViQuest return the molds did not lack a "colorable justification" under Vermont law.  In any event, even if the majority based its decision on an error or misunderstanding of Vermont law, its decision must be upheld since Burton's allegations do not amount to an "egregious impropriety" on the part of the majority that would justify overturning its decision.

3. ViQuest's Lost Profits

Burton argues that while the majority acknowledged that ViQuest "bears the burden of reasonably proving the quantum of the desired compensation by appropriate means," and that ViQuest had offered insufficient evidence to quantify its lost profits, the majority improperly awarded ViQuest $360,780.70 in lost profits for the 2006 fiscal year.  Burton also argues that the majority ignored the fact that the Agreement had no minimum purchase requirement and that ViQuest had failed to mitigate its

14

losses.  Burton's objections to the majority's decision to award ViQuest lost profits are unavailing.

The majority found that ViQuest was entitled to lost profits due to Burton's improper termination of the Agreement in the middle of the 2006 fiscal year.  Under Vermont law, "[t]he key inquiry in the recovery of lost profits remains whether the damages can be easily ascertained and measured; mathematical certainty is not required, but there must be a reasonable basis for estimating the loss."  State v. May, 689 A.2d 1075, 1077 (Vt. 1996).  The majority based its calculation of lost profits on ViQuest's 2005 net profits[3], but reduced this amount "in view of different factors potentially compromising the continuation of [ViQuest's] business throughout [the 2006 fiscal year] irrespective of Burton's termination."  The majority further reduced the amount of lost profits awarded because there was "no evidence that [ViQuest] undertook to find a replacement for Burton . . . or that it looked for other customers."  While the majority noted that these reductions could not "be calculated with mathematical certainty," it is clear that the majority nonetheless believed it had a "reasonable basis" for its calculation of lost profits attributable to Burton's termination

---

[3] The majority noted that Burton had not raised any objections to ViQuest's expert's calculation of ViQuest's net profits for 2005, although Burton had objected to other parts of the expert report.

of the Agreement.  As such, the amount of lost profits awarded to ViQuest was based on more than a "barely colorable justification" and was therefore not in manifest disregard of Vermont law.

4. Pre-Award Interest

Burton initially argued that the majority acted in manifest disregard of the law by awarding pre-Award interest, at least with respect to ViQuest.  Burton appears to have abandoned this argument, however, in its reply brief.  As Burton itself acknowledges, under Vermont law, an award of prejudgment interest is discretionary.  See Fleming v. Nicholson, 168 A.2d 1026, 1029 (Vt. 1998) ("Even if the damages . . . were not readily ascertainable, . . . the trial court maintains the ability to award prejudgment interest in a discretionary capacity to avoid injustice.").  Burton's objection to the majority's decision to award pre-judgment interest is therefore without merit.

5. Attorney's Fees

Burton argues that "once this Court vacates those portions of the Award improvidently entered, Burton shall be the prevailing party in this dispute" and will be entitled to recover its attorney's fees for the arbitration pursuant to § 7.09 of the Agreement.  Because no part of the Award has been

16

modified or vacated, there is no basis for modifying the majority's decision on attorney's fees and costs arising from the arbitration.

Pursuant to §§ 7.08 and 7.09 of the Agreement, ViQuest seeks attorney's fees and costs that it incurred in opposing Burton's petition to vacate and in seeking confirmation of the Award. ViQuest is the prevailing party with respect to both Burton's petition to vacate and its own cross-petition to confirm. As such, ViQuest is entitled to recover reasonable attorney's fees and costs in connection with this action.

## CONCLUSION

Burton's April 14, 2010 petition to vacate the Award is denied and ViQuest's May 28, 2010 cross-petition to confirm the Award is granted. ViQuest is awarded reasonable attorney's fees and costs of an amount to be determined after additional briefing pursuant to a separate scheduling order to be issued with this Opinion.

SO ORDERED:

Dated: New York, New York
August 3, 2010

_____
DENISE COTE
United States District Judge

17